# In the United States Court of Federal Claims

No. 12-865
Filed: September 30, 2013

*******************************************
|  |  |
|---|---|
| | * |
| | * Administrative Procedure Act, 5 U.S.C. § 706; |
| | * Contract Disputes Act, 41 U.S.C. § 7103; |
| | * Declaratory Relief Act, 28 U.S.C. § 2201; |
| SIGMA CONSTRUCTION, INC., | * Duty of Good Faith and Fair Dealing; |
| a/k/a SIGMA SERVICES, INC., | * Federal Acquisition Regulation, |
| | *     2.101 (contract modification); |
| Plaintiff, | *     43.103(a) (bilateral contract modification); |
| | *     49.001 (settlement agreement); |
| v. | *     49.107 (audit of settlement proposals); |
| | *     52.249-2(a) (termination for convenience of |
| THE UNITED STATES, | *         the Government – fixed price); |
| | * Small Business Act, 15 U.S.C. § 637(a)(1)(B); |
| Defendant. | * Motion to Dismiss, |
| | *     RCFC 12(b)(1) (lack of subject matter |
| | *         jurisdiction); |
| | *     RCFC 12(b)(6) (failure to state a claim). |
| | * |
*******************************************

**Robert A. Brunette**, Law Offices of Robert A. Brunette, Glendale, California, Counsel for Plaintiff.

**Katy M. Bartelma**, United States Department of Justice, Civil Division, Washington, D.C., Counsel for the Government.

## MEMORANDUM OPINION AND FINAL ORDER

**Braden,** *Judge*.

## I.     FACTUAL BACKGROUND.[1]

On April 22, 2008, SIGMA Construction, Inc. ("Sigma" or "Plaintiff") submitted a proposal in response to a Request For Proposals ("RFP") No. GS-09P-07-NP-C-0005, issued by the United States General Services Administration ("GSA" or the "Government"). Compl. ¶ 6.

---

[1] The facts discussed herein were derived from the December 12, 2012 Complaint ("Compl.") and attachments thereto ("Pl.'s Attach. 1–8").

The project was an 8(a)[2] sole source procurement for a design/build contract to install a roofing system on the Hawthorne Federal Building in Lawndale, California. Compl. ¶ 6. Sigma and GSA negotiated and agreed upon a final contract price of $979,588. Compl. ¶ 7. On May 30, 2008, Sigma was awarded GSA Contract No. GS-09P-08-NPC-0005 ("the Contract"). Compl. ¶ 8. The initial schedule required approval for shop drawings within 30 days, with roof construction to be completed 130 days thereafter. Compl. ¶ 7. On June 24, 2008, the initial Contracting Officer ("CO") issued a letter confirming the GSA's receipt of Sigma's Performance and Payment Bonds and establishing November 6, 2008 completion date. Pl.'s Attach. 1.

Numerous incidents, however, delayed the scheduled construction. GSA did not timely approve Sigma's performance bonds and shop drawings. Compl. ¶ 9. In addition, GSA requested that Sigma change access authorization for twenty-three workers, requiring fingerprints and a background investigation for each worker. Compl. ¶ 9. And, in May 2009, a dispute about the warranty occurred. Compl. ¶ 9.

On May 21, 2009, a new CO sent Sigma a Notice to Proceed for on-site work that stated: "because of factors out of [Sigma's] control," the Contract needed to be modified to reflect a new completion date of October 1, 2009. Pl.'s Attach. 1; *see also* Compl. ¶ 10.

On September 24, 2009, the GSA disclosed that a 2003 "Asbestos-Containing Material Field Survey Report" indicated that the roof contained toxic asbestos. Compl. ¶ 9. In response, Sigma provided GSA with a cost proposal for asbestos abatement. Compl. ¶ 9.

On October 5, 2009, Sigma requested from GSA compensation for the increased costs of abatement and additional time required to complete the project. Compl. ¶ 11.

On April 6, 2010, the GSA terminated the Contract, pursuant to Federal Acquisition Regulation ("FAR") 52.249-2(a) "Termination for Convenience of the Government—Fixed Price." Compl. at ¶ 12.

On November 12, 2010, Sigma submitted a Request For Equitable Adjustment ("REA") to the GSA for delay-related cost increases in the amount of $823,904. Compl. ¶ 13.

On February 18, 2011, the CO directed Sigma to submit a document combining the REA with a Termination Settlement Proposal. Compl. ¶ 14

On March 21, 2011, Sigma submitted a consolidated proposal requesting $86,106 as a Termination Settlement Proposal, together with the previously submitted REA for $823,904, for the combined amount of $1,116,220. Compl. ¶ 15. At the CO's direction, Sigma included, in the combined amount, two prior GSA progress payments in the amount of $206,010. Compl. ¶ 15.

On September 19, 2011, Sigma submitted a separate certification of the March 21, 2011 Termination Settlement Proposal for $86,106. Compl. ¶ 16. Thereafter, the CO advised Sigma's

---

[2] The 8(a) program is established by the Small Business Act to arrange for and assist socially and economically disadvantaged small businesses in the performance of procurement contracts for construction work and other services. *See* 15 U.S.C. § 637(a)(1)(B).

CEO that a GSA review and analysis of Sigma's proposals was underway. Compl. ¶ 17. On November 22, 2011 the GSA sent via e-mail an attached signed letter offering "final settlement amount of $235,842, all items considered." Compl. ¶ 17. Sigma rejected the offer. Compl. ¶ 17.

On December 1, 2011, the CO and Sigma's CEO negotiated a $485,000 settlement in a telephone conference, in addition to the $206,210 GSA previously paid as progress payments. Compl. ¶¶ 18–19. The CO advised Sigma's CEO that a written confirmation of this amount would be forthcoming. Compl. ¶ 19.

On December 6, 2011, the CO e-mailed Sigma a letter confirming that the December 1, 2011 agreement would be issued as a "final supplemental modification to the [C]ontract." Pl.'s Attach. 3; *see also* Compl. ¶ 20. The letter also stated that "[t]he supplemental modification finalizing the settlement agreement under the [C]ontract will be transmitted to you for your signature prior to final execution by the Government." Pl.'s Attach. 3.

But, on January 30, 2012, the CO sent an e-mail letter to Sigma stating that "the final modification requires a review by the GSA's Regional office." Compl. ¶ 23.

On April 20, 2012, the CO sent another e-mail. The CO advised Sigma that, pursuant to GSA's internal review, the GSA concluded that the "[December 1, 2011] negotiated settlement has not been deemed acceptable and w[ould] not be approved without a complete third party audit." Pl.'s Attach. 4; *see also* Compl. ¶ 24. The CO also stated that the GSA would like to re-open negotiations to avoid an audit. Pl.'s Attach. 4; Compl. ¶ 24.

On April 24, 2012, Sigma responded by e-mail that it considered the December 1, 2011 agreement final and declined to renegotiate. Compl. ¶ 25. On May 30, 2012, Sigma's counsel sent a letter to GSA stating that the settlement contract modification required GSA to pay Sigma $485,000. Compl. ¶ 26. On June 22, 2012, the CO reaffirmed GSA's position and informed Sigma that the GSA had initiated an audit. Compl. ¶ 26.

On August 13, 2012, Sigma's CEO mailed the CO a certified claim requesting payment of $485,000, plus interest. Compl. ¶ 29; Pl.'s Attach. 5. Sigma also requested that the CO "issue a written final decision on this claim." Compl. ¶ 29; Pl.'s Attach. 5.

On September 13, 2012, GSA's Office of the Inspector General ("OIG") contacted Sigma for information. Compl. ¶ 30. Sigma responded that an audit was unnecessary because Sigma previously provided a REA and the Termination Settlement Proposal to the CO, as well as a certified invoice for the negotiated amount. Compl. ¶ 30. On that same date, Sigma mailed a second copy of the CDA claim to the CO via registered mail. Compl. ¶ 31.

On September 20, 2012, the OIG advised Sigma by e-mail that the Termination Settlement Proposal was not valid and requested additional information about Sigma's delay claim. Pl.'s Attach. 6; *see also* Compl. ¶ 32.

On October 29, 2012, Sigma contacted the CO again, reasserting the August 13, 2012 claim for $485,000 and requesting a final written decision. Compl. ¶ 35.

On November 13, 2012, after receiving no reply from the CO, Sigma mailed a third certified copy of Plaintiff's August 13, 2012 claim.  Pl.'s Attach. 8; *see also* Compl. ¶ 36.  As of December 12, 2012, the GSA did not respond.  Compl. ¶ 37.

## II.   PROCEDURAL HISTORY.

On December 12, 2012, Sigma filed a Complaint in the United States Court of Federal Claims seeking: (1) judgment under the Declaratory Relief Act, 28 U.S.C. § 2201 (Compl. ¶¶ 38–40); (2) mandamus under the Administrative Procedure Act, 5 U.S.C. § 706 (Compl. ¶¶ 41–44); and (3) $485,000 plus costs for GSA's breach of the December 1, 2011 settlement agreement.  Compl. ¶¶ 45–54.

On April 19, 2013, the Government filed a Motion To Dismiss, pursuant to Rules of the United States Court of Federal Claims ("RCFC") 12(b)(1) and 12(b)(6).

On April 26, 2013, Sigma filed a Motion For Summary Judgment.  On April 30, 2013, the Government filed a Motion To Stay Briefing On Plaintiff's Motion For Summary Judgment.  On May 3, 2013, Plaintiff filed a Response.  On May 7, 2013, the parties were informed that the court would address any jurisdictional issues first and instructed the parties to finalize briefing on the Government's April 19, 2013 Motion To Dismiss.

On May 10, 2013, Sigma filed a "Request For Leave To Amend The Complaint To Strike [Plaintiff's] First And Second Claims For Relief."  On May 21, 2013, the court granted that request.  As such, the Government's April 19, 2013 Motion To Dismiss, insofar as it pertains to Plaintiff's First and Second Claims for relief—under the Declaratory Judgment Act and Administrative Procedure Act, respectively—is moot.

On May 13, 2013, Sigma filed a Response To the Government's Motion To Dismiss and attached pages 19-38 of Sigma's April 26, 2013 Motion For Summary Judgment, pursuant to RCFC 5.4(b)(3).  On June 5, 2013, the Government filed a Reply.

On September 24, 2013, the court held a telephonic oral argument with the parties concerning the Government's Motion to Dismiss and Sigma's Response.  Following that argument, the Government filed a Status Report on September 27, 2013.[3]

---

[3] In its September 27, 2013 Status Report, the Government estimated that, upon submission by Sigma of its claims pursuant to the Contract Disputes Act and dismissal of this litigation, the Contracting Officer would renew the audit request with the GSA within five business days.  Gov't Status Rep. 1.  GSA anticipates beginning the audit in January 2014 and completing it within 90 days.  Gov't Status Rep. 1–2.  At that point, the Contracting Officer will issue a final decision within 60 days.  Gov't Status Rep. 2.

### III.    DISCUSSION.

#### A.    Jurisdiction.[4]

The United States Court of Federal Claims has jurisdiction under the Tucker Act, 28 U.S.C. § 1491, "to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). The Tucker Act, however, is "a jurisdictional statute; it does not create any substantive right enforceable against the United States for money damages . . . the Act merely confers jurisdiction upon [the United States Court of Federal Claims] whenever the substantive right exists." *United States* v. *Testan*, 424 U.S. 392, 398 (1976) (citations omitted). Therefore, to pursue a substantive right under the Tucker Act, a plaintiff must identify and plead an independent contractual relationship, Constitutional provision, federal statute, and/or executive agency regulation that provides a substantive right to money damages. *Todd v. United States*, 386 F.3d 1091, 1094 (Fed. Cir. 2004) ("[J]urisdiction under the Tucker Act requires the litigant to identify a substantive right for money damages against the United States separate from the Tucker Act itself."); *see also Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005) (en banc) ("The Tucker Act . . . does not create a substantive cause of action; in order to come within the jurisdictional reach and the waiver of the Tucker Act, a plaintiff must identify a separate source of substantive law that creates the right to money damages. In the parlance of Tucker Act cases, that source must be 'money-mandating.'").

#### B.    Relevant Standards Of Review.

A challenge to the United States Court of Federal Claims' "[ability] to exercise its general power with regard to the facts peculiar to the specific claim . . . . is raised by a [Rule] 12(b)(6) motion . . . ." *Palmer v. United States,* 168 F.3d 1310, 1313 (Fed. Cir. 1999); *see also* RCFC 12(b)(6) (allowing a party to assert, by motion, "failure to state a claim upon which relief can be granted"). When considering whether to dismiss an action for failure to state a claim, the court must assess whether the complaint states "allegations plausibly suggesting (not merely consistent with)" behavior by defendant that, if proven, would entitle the plaintiff to judicial relief. *See Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 557 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) ("[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss."). In other words, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the

---

[4] The December 12, 2012 Complaint is captioned as a suit against the Government, as well as "Does 1 through 5, inclusive" who allegedly "participated in, conspired, and contributed to the damages suffered" by Plaintiff. Compl. ¶ 4. The only proper defendant in the United States Court of Federal Claims, however, is the United States. *See* 28 U.S.C. § 1491(a); *see also* RCFC 10. Therefore, the court does not have jurisdiction to adjudicate the claims against Does 1 through 5.

complaint are true (even if doubtful in fact)." *Bell Atl. Corp.*, 550 U.S. at 555 (internal citations omitted). *But see Iqbal*, 556 U.S. at 678 ("[T]he tenet that a court must accept as true all the allegations contained in a complaint is inapplicable to legal conclusions.").

    **C.**    **Issues Raised In The Government's April 19, 2013 Motion To Dismiss.**

        **1.**    **Whether The December 12, 2012 Complaint Alleged Sufficient Facts To Conclude That The Government Entered Into An Enforceable Oral Settlement.**

            **a.**    **The Government's Argument.**

    The Government argues that the December 12, 2012 Complaint fails to allege sufficient plausible facts to establish the existence of a separate, enforceable contract arising out of the December 1, 2011 oral negotiations concluded. Gov't Mot. 8–15. Any oral or written settlement agreement purporting to arise out of the original GSA contract is invalid because, as a matter of law, an agency-level resolution of a settlement request only can be made by a written modification. Gov't Mot. 8 (citing FAR 49.001 (defining "settlement agreement" as a "written agreement") and FAR 49.109-1[5] (requiring Standard Form 30 for settlement agreements)). In addition, a contracting officer cannot resolve a payment request under to a GSA contract by entering into a separate agreement purporting to govern the same terms as the original. Gov't Mot. 9 (citing *Schism v. United States*, 316 F.3d 1259, 1278 (Fed. Cir. 2002) (holding that an express contract precludes the existence of an implied-in-fact contract purporting to govern the same subject matter)). Although the Government concedes that *Schism*'s holding concerned an implied-in-fact contract, in this case Sigma "has not explained why an express contract purporting to govern the same subject matter as another express contract is any more acceptable than an [implied-in-fact] contract purporting to do the same." Gov't Reply 4–5. In addition, "in the event that the parties could not agree on a modification and a contractor's subsequent claim is denied, then the contractor's sole remedy is a suit brought pursuant to the Contract Disputes Act (CDA)." Gov't Mot. 9.

    The cause of action in this case, however, is not premised on a contract. Gov't Mot. 9 n.3. But, even if Sigma is allowed to amend the Complaint to allege a breach of contract, this claim also must be dismissed, because Sigma has identified no provision or clause, contract modification, or any other obligation sufficient to establish, above a speculative level, the existence of an obligation to pay $485,000. Gov't Mot. 15. Sigma has not contested these facts, nor the arguments relating to the requirements of the FAR, and therefore has conceded these arguments. Gov't Reply 5, 12.

    Even if a separate agreement could be reached outside of the Contract, the parties did not meet all of the requisite elements of contract formation, because Sigma's "allegations reveal the parties contemplated the execution of a written contract modification and the [CO] possessed only the authority to resolve [Sigma's] requests by means of a written contract modification" on Standard Form 30. Gov't Mot. 10–11 (citing FAR 43.103(a) (describing a "bilateral modification" as a modification signed by both parties used to "[m]ake negotiated equitable

_____
    [5] The Government mistakenly cites to FAR 49.109-2, but quotes FAR 49.109-1.

adjustments [that r]eflect other agreements of the parties modifying the terms of [the] contract[]"); FAR 43.301(a)(1) (providing that SF 30 "shall . . . be used for . . . (v) [s]upplemental agreements")).  In addition, opinions hold that "oral negotiations, even if confirmed, do not give rise to a binding contract where . . . the parties anticipate the execution of a formal written agreement."  Gov't Mot. 11–12 (citing *SCM Corp. v. United States*, 595 F.2d 595, 598 (Ct. Cl. 1979) (holding that an oral agreement to settle an REA was not a binding contract, where, in light of the regulations and the parties' understanding, the commitments in the oral understanding were not to be consummated until the execution of a written supplemental agreement as reflected on a Form SF 30); *see also Mil-Spec Contractors, Inc. v. United States*, 835 F.2d 865, 867 (Fed. Cir. 1987) ("Unless and until there was a binding modification to which both [plaintiff] and the contracting officer had agreed in writing, there could not be a binding modification of the contract.")).

In this case, the parties agreed in principle to an amount to settle their dispute, but contemplated a written document to finalize that agreement.  Gov't Reply 10.  The CO is presumed to act in accordance with the law, which is evidenced by references to the need for a supplemental modification.  Gov't Reply 10 (citing Compl. ¶¶ 20, 23).  In any case, the CO did not have the authority to waive any legal requirements or alter her authority.  Gov't Mot. 14; Gov't Reply 10–11.  Further, as a government contractor, Sigma "is charged with knowledge of the regulatory requirements," and the facts alleged in the Complaint raise a plausible inference that Sigma indeed understood the need for a written modification.  Gov't Reply 11.  Therefore, whether the CO made any assurances or statements of authority, they are not dispositive of the CO's actual authority or the existence of a contract.  Gov't Reply 11–12.  Sigma "requests the Court to review the applicability of the common law" (Pl.'s Resp. 6–7), but "general principles do not challenge [the Government's] specific demonstration of the applicable regulatory requirements."  Gov't Reply 6.  Nor do non-binding decisions of the Boards of Contract Appeals outweigh the Government's demonstration that the oral negotiations could not have given rise to a binding contract.  Gov't Reply 6–7.

As the May 13, 2013 Response clarifies, the sole basis of Sigma's claim is that the December 1, 2011 oral settlement agreement has the effect of a contract.  Gov't Reply 3 (citing Compl. ¶ 48–49 and Pl.'s Resp. 4–5).  Sigma specifically disclaimed that the settlement was implied-in-fact and arose out of anything other than the parties' verbal agreement.  Gov't Reply 3 (citing Pl.'s Resp. 5 ("This case concerns an express oral contractual settlement arising from Sigma's claims in the express written GSA construction contract.")).  Reliance on an oral agreement with the Government invokes 31 U.S.C. § 1501(a) ("An amount shall be recorded as an obligation of the United States Government only when supported by documentary evidence of . . . a binding agreement between an agency and another person . . . that is . . . in writing . . . and executed . . . .").  Gov't Reply 3.  Plaintiff's reliance on an express oral contract does not meet this statutory requirement.  Gov't Reply 3–4; *see also Daly Construction, Inc. v. Garret*, 5 F.3d 520, 521 (Fed. Cir. 1993) ("To recover on an express agreement with a Government agency, the agreement must be in writing and signed by an authorized person.").

### b.      The Plaintiff's Response.

Sigma responds that the December 12, 2012 Complaint alleged substantial and sufficient facts to evidence the plausible existence of a binding express oral agreement with the GSA.  Pl.'s

Resp. 2–3. The allegations therein are sufficient to meet the RCFC 12(b)(6) standard, as they "state plausible grounds for the [c]ourt to infer that a binding settlement agreement was intended by both [p]arties to be negotiated and finalized on December 1, 2011—meeting the four basic contract formation requirements." Pl.'s Resp. 4 (quoting from *Anderson v. United States*, 344 F.3d 1343, 1353 (Fed. Cir. 2003) ("To form an agreement binding upon the government, four basic requirements must be met: (1) mutuality of intent to contract; (2) lack of ambiguity in offer and acceptance; (3) consideration; and (4) a government representative having actual authority to bind the United States in contract.")).

The GSA, as an agency of the United States, is bound by common law contract rules when it acts in its contracting capacity. Pl.'s Resp. App. 19–21 (citing *United States v. Winstar Corp.*, 518 U.S. 839, 895 (1996) ("An even more serious objection is that allowing the Government to avoid contractual liability merely by passing any 'regulatory statute' would flout the general principle that, '[w]hen the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals.'" (quoting *Lynch v. United States*, 292 U.S. 571, 579 (1934))). As such, the common law contract formation requirements apply to the December 1, 2011 settlement agreement. Pl.'s Resp. 4; Pl.'s Resp. App. 21–23. In addition, the GSA is bound by the conduct of its CO, as an authorized agent, under the rule of finality. Pl.'s Resp. 4; Pl.'s Resp. App. 23–25. For this reason, the Armed Services Board of Contract Appeals has held that an enforceable oral agreement can be formed when the Government accepts an offer, without the necessity of any formal modification of the contract. Pl.'s Resp. 4; Pl.'s Resp. App. 25–27 (citing *In re MPR Assocs., Inc.*, ASBCA No. 54689, 05-2 B.C.A. (CCH) ¶ 33115 (Oct. 27, 2005) ("[T]he government may enter into an enforceable oral agreement with respect to resolution of rights under a contract without formal modification of the contract itself.")).

In addition, the December 1, 2011 oral agreement was not executory and did not contemplate a formal contract modification or use of a SF 30 Form. Pl.'s Resp. App. 27–33. Contrary to the Government's argument, the CO never mentioned the need for any written contract modification or SF 30 Form during the negotiations leading up to the December 1, 2011 final settlement. Pl.'s Resp. 7. The CO only unilaterally raised this requirement for the first time in her December 6, 2011 letter. Pl.'s Resp. 7. In addition, contrary to the Government's reliance on *SCM Corporation*, a number of decisions of the United States Court of Claims and various Boards of Contract Appeals decided after *SCM* and *Mil-Spec* support the proposition that the absence of an SF 30 Form is not dispositive. Pl.'s Resp. 7–8 (citing *Robinson Contracting Co. Inc. v. United States*, 16 Cl. Ct. 676, 681, 688 (1989) (describing the execution of a SF 30 Form as a "mere formality" in the specific circumstances of that case); *see also Adams Constr. Co.*, VABCA No. 4669, 97-1 B.C.A. (CCH) ¶ 28801 (Feb. 13, 1997) ("Thus, *Mil-Spec* does not establish a rigid, formalistic standard that would permit an enforceable, bilateral agreement modifying a contract to arise only upon a talismanic execution of the SF-30 by both parties . . . .")); Pl.'s Resp. App. 27–33.

Finally, the Government's April 19, 2013 Motion To Dismiss misstates the facts and misapplies case law. Pl.'s Resp. 5–6. First, contrary to the Government's argument, the December 12, 2012 Complaint contains plausible allegations that the parties intended and reached "a binding lump-sum settlement agreement" to satisfy the claims set forth in Sigma's combined REA and Termination Settlement Proposal. Pl.'s Resp. 5. In addition, the

Government's reliance on *Schism* is misplaced because the rule established therein precludes only the existence of an implied-in-fact contract that purports to cover the same subject matter as an express contract.  Pl.'s Resp. 5–6.  That is not the situation here.  Third, Sigma has satisfied the elements of contract formation: Sigma's offer and the CO's acceptance were unambiguous and specific; Sigma's $425,010 reduction in its consolidated proposal from the $910,000 amount claimed was more than adequate consideration; the CO was warranted on July 9, 2009 and authorized to bind the Government up to amounts well in excess of the $485,000 offered and was the assigned Government representative with actual authority to finalize the agreement (Compl. ¶ 18; Pl.'s Attach. 2); and there is $773,378 still obligated and available under the Contract to pay Sigma the agreed-to amount, so that there is no need for a supplemental modification to increase funding to pay that amount.  Pl.'s Resp. 3, 6; Pl.'s Resp. App. 22–23.

### c.    The Court's Resolution.

The first issue before the court is whether the December 12, 2012 Complaint has alleged sufficient plausible facts to state a claim for breach of the alleged December 1, 2011 oral settlement agreement reached between Sigma and the GSA.

In general, an agreement must meet four basic elements in order to bind the government:

(1) mutuality of intent to contract;
(2) lack of ambiguity in offer and acceptance;
(3) consideration; and
(4) a government representative having actual authority to bind the United States in contract.

*Anderson*, 344 F.3d at 1353.  The court is mindful that in some contexts, oral agreements can be binding.  *See, e.g.*, *Tiburzi v. Dep't of Justice*, 269 F.3d 1346 (Fed. Cir. 2001) (finding an oral settlement agreement between a Drug Enforcement Agency employee and the Agency to be binding).

The Federal Acquisition Regulation ("FAR"), however, imposes additional requirements. FAR Part 49 states that the settlement of a contract terminated for convenience requires a written contract modification, executed by both the contractor and the terminating contract officer, on a Form SF 30.  FAR 49.001 defines a "settlement agreement" as a "written agreement in the form of a contract modification settling all or a severable portion of a settlement proposal."  FAR 49.109-1 provides that "[w]hen a termination settlement has been negotiated and all required reviews have been obtained, the contractor and [terminating contracting officer] shall execute a settlement agreement on Standard Form 30."  48 C.F.R. § 49.001; 48 C.F.R. § 49.109-1.  In addition, FAR 2.101 defines a contract modification as "any written change in the terms of a contract."  48 C.F.R. § 2.101.  FAR 43.103 defines a "bilateral modification" or "supplemental agreement" as a "contract modification that is signed by the contractor and the contracting officer" and used to, among other things, "reflect . . . agreements of the parties modifying the terms of contracts."  48 C.F.R. § 43.103.  And, FAR 43.301 provides that the SF 30 "shall . . . be used for . . . supplemental agreements."  48 C.F.R. § 43.301(a)(1)(v).

The United States Court of Appeals for the Federal Circuit has recognized that these provisions of the FAR "require that a modification of a contract be in writing and executed by both parties." *Mil-Spec*, 835 F.2d at 867–68. Moreover, these provisions support "the basic principle . . . that an oral modification of a written contract, which may be modified only by bilateral written agreement, is ineffective." *Id.* at 869; *cf. SCM Corp.*, 595 F.2d at 597–98 (holding that an oral agreement reached by the parties—where the Armed Services Procurement Regulations, which, like the FAR, "view a settlement as a separate written contract altering the rights and liabilities of the parties"—"was not a contract and [could not] sustain a breach of contract action").

While Sigma cites several cases for the proposition that the absence of an executed SF 30 Form is not dispositive, these cases are either inapposite or not binding. For example, Sigma characterizes *Robinson Contracting* as "finding that the use of a[n] SF-30 was a 'mere formality' (after an oral agreement was in fact created)." Pl.'s Resp. 7. Although *Robinson* did determine that the absence of a SF 30 Form was not dispositive, the accord that the appellate court determined was enforceable "was not solely oral . . . . [and b]oth parties signed a written agreement" that was complete and unambiguous. 16 Cl. Ct. at 688–89. Likewise, Sigma's reliance on *Texas Instruments Inc. v. United States*, 922 F.2d 810 (Fed. Cir. 1990), is misplaced. In that case the United States Court of Appeals for the Federal Circuit held that a binding agreement was reached in the absence of a written agreement, after also finding that the "agreement was not a 'bilateral modification of a contract' but rather a fulfillment of an express contractual term," and that "[t]he regulations governing *Mil-Spec* and *SCM* simply [were] inapplicable to the facts." *Id.* at 814. In any event, regardless of whether an SF 30 Form is an absolute prerequisite to a binding settlement agreement or a mere formality, the FAR is clear that an agreement settling a termination for convenience, as with any other bilateral contract modification, must be in a written agreement and executed by both the contractor and the contracting officer. *See Mil-Spec*, 835 F.2d at 867 ("Unless and until there was a binding modification to which both Mil-Spec and the contracting officer had agreed in writing, there could not be a binding modification of the contract. The oral agreement . . . could not and did not constitute a valid accord and satisfaction."). That did not occur in this case.

Instead, the CO and Sigma's CEO participated in a telephone negotiation on December 1, 2011, during which the parties reached an oral agreement on a settlement amount. Compl. ¶¶ 18–19. On December 6, 2011, the CO e-mailed Sigma a signed and dated letter that confirmed the December 1, 2011 negotiated settlement amount "determined to be acceptable under a final settlement agreement, to be issued as a final supplemental modification to the [C]ontract." Compl. ¶ 20; Pl.'s Attach. 3. The letter further stated, "[t]he supplemental modification finalizing the settlement agreement under the contract will be transmitted to you for signature prior to final execution by the Government." Pl.'s Attach. 3. The CO's e-mail thus made clear to Sigma that the signed December 6, 2011 letter confirmed the agreed-upon settlement amount, but that a formal contract modification, as required by the FAR, would be forthcoming. Therefore, pursuant to the FAR provisions cited above, the December 1, 2011 oral agreement alone did not create a binding final settlement agreement between the parties. Instead, the parties were required to execute a written contract modification. The December 12, 2012 Complaint contains no allegations that the parties did so.

Assuming, *arguendo*, the validity of Sigma's allegations that the CO indicated the intention to finalize a settlement agreement during the December 1, 2011 telephone conference, and never provided notice of the need for a written modification or any upper-level review at that time, these facts are not dispositive. After the December 1, 2011 telephone conference, the parties did not take the steps necessary to execute a binding contract. Moreover, Sigma is "'charged with notice of all statutory and regulatory limitations,'" including the limits of the CO's authority. *CACI, Inc. v. Stone*, 990 F.2d 1233, 1236 (Fed. Cir. 1993) (quoting *Prestex, Inc. v. United States*, 320 F.2d 365, 371 (Ct. Cl. 1963)); *see also SCM Corp.*, 595 F.2d at 598 ("Parties are presumed to know and required to be cognizant of the governing regulations."). As a matter of law, the CO does not have the authority to waive statutory or regulatory requirements. *See United States v. Amdahl Corp.*, 786 F.2d 387, 392 (Fed. Cir. 1986) ("Failure to follow the applicable rules negates the agent's authority to enter into a contract binding on the government. To permit otherwise would be to nullify those very statutes, regulations, and determinations—a result clearly contrary to the public interest." (quoting Brous, *Termination for Convenience: A Remedy for the Erroneous Award*, 5 Pub. Cont. L.J. 221, 222–23 (1972)). Nor is the Government "bound by its agents acting beyond their authority and contrary to regulation." *CACI*, 990 F.2d at 1236 (quoting *Urban Data Sys., Inc. v. United States*, 699 F.2d 1147, 1153 (Fed. Cir. 1983)).

Therefore, the court has determined, as it must, that because the alleged oral settlement did not comply with FAR provisions 49.001 and 49.109-1 requiring a written modification for a settlement of a termination for convenience, and because the CO did not have authority to enter into an oral settlement, the December 12, 2012 Complaint fails to allege facts sufficient to establish the existence of a contractual obligation binding on the Government.

### 2.    Whether The December 12, 2012 Complaint States A Claim For Breach Of The Duty Of Good Faith And Fair Dealing.

#### a.    The Government's Argument.

The Government argues that the December 12, 2012 Complaint's claim that the GSA breached the duty of good faith and fair dealing also must be dismissed. Gov't Mot. 15 (citing Compl. ¶ 52 ("Said contract entered into between Plaintiff and the Government contains said implied-in-law covenant [of good faith and fair dealing] by which the GSA assumed this duty, and promised to promptly transmit to Plaintiff a written contract modification . . . .")). The implied duty of good faith and fair dealing does not exist in the absence of an underlying contract, so Sigma has no claim for the breach of the implied duty in this case. Gov't Mot. 16 (citing *Scott Timber Co. v. United States*, 692 F.3d 1365, 1372 (Fed. Cir. 2012) ("[B]ecause the existence of the covenant of good faith and fair dealing depends on the existence of an underlying contractual relationship, there is no claim for a breach of this covenant where a valid contract has not yet been formed." (alterations omitted)). In addition, the Government is liable for a breach of the duty of good faith and fair dealing "only where the Government's purpose in acting 'was to specifically target the plaintiff and reappropriate a benefit guaranteed by a contract with the plaintiff.'" Gov't Mot. 16 (quoting *Scott Timber*, 692 F.3d at 1375). Even assuming the settlement was a contract, Sigma has not alleged any action by the GSA to specifically target Sigma and re-appropriate a benefit guaranteed by the contract, since the GSA simply followed applicable regulations. Gov't Mot. 16–17. In addition, the December 12, 2012 Complaint failed

to set forth plausible facts that identify the elements necessary for a breach of the duty of good faith and fair dealing or to evidence specifically targeted actions by the GSA.  Gov't Reply 12–13.

> **b.      The Plaintiff's Response.**

Sigma responds that the simple showing required to claim a breach of the duty of good faith and fair dealing is an allegation that the "party's contracting partner deprived it of the fruits of the contract."  Pl.'s Resp. 8–9 (quoting *Riviera Agredano v. United States*, 70 Fed. Cl. 564, 574 n.8 (2006)).  A breach of this duty can be established by showing, *inter alia*, "lack of diligence, negligence or failure to cooperate or through subterfuges and evasions . . . even though the actor believes his/her conduct to be justified, or by failing to communicate with plaintiff for a long period, or by refusing to respond to many requests, or a lack of honesty in fact in the conduct or transaction concerned."  Pl.'s Resp. 9 (emphasis and footnotes omitted).

In this case, the December 12, 2012 Complaint alleges that the CO repeatedly assured Sigma that a thorough GSA review and analysis of Sigma's proposals was ongoing.  Compl. ¶ 7.  The CO represented that she had the legal authority to finalize and accept Sigma's offer.  Pl.'s Resp. 9.  Nevertheless, on January 30, 2012, the CO advised Sigma for the first time that the December 1, 2011 settlement agreement required review by the GSA.  Pl.'s Resp. 9 (citing Compl. ¶¶ 17–20, 23).  And, on April 20, 2012, June 22, 2012, and October 16, 2012, the CO stated that she would demand a third party audit, unless Sigma agreed to re-open negotiations.  Pl.'s Resp. 9 (citing Compl. ¶¶ 24, 26–28, 33).  Moreover, the CO never responded to or acknowledged Plaintiff's repeated CDA claims.  Pl.'s Resp. 9–10 (citing Compl. ¶¶ 29, 31, 33, 35–37).  Finally, the Government tries to narrow the scope of Sigma's good faith and fair dealing claim only to GSA's conduct regarding the December 1, 2011 settlement, but the covenant also attaches to the underlying Contract, as well.  Pl.'s Resp. 10.

> **c.      The Court's Resolution.**

As both parties recognize, government contracts, like contracts between private individuals, include an implied duty of good faith and fair dealing that requires each party not to interfere with the other party's rights under the contract.  *See Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817, 828 (Fed. Cir. 2010) ("The duty of good faith and fair dealing is inherent in every contract. . . . In essence, this duty requires a party to not interfere with another party's rights under the contract." (internal citations omitted)); *see also Centex Corp. v. United States*, 395 F.3d 1283, 1304 (Fed. Cir. 2005) (same).  Because the implied duty protects contractual rights, what it "entails depends in part on what [a given] contract promises."  *Precision Pine*, 596 F.3d at 830.  But, the implied duty of good faith and fair dealing "cannot expand a party's contractual duties beyond those in the express contract or create duties inconsistent with the contract's provisions."  *Id.* at 831; *see also Bradley v. Chiron Corp.*, 136 F.3d 1317, 1326 (Fed. Cir. 1998) (citing *Racine & Laramie, Ltd. v. Cal. Dep't of Parks & Recreation*, 11 Cal. App. 4th 1026 (1992) for the proposition that "implied covenants of good faith and fair dealing are limited to assuring compliance with the express terms of the contract and [cannot] be extended to create obligations not contemplated in the contract").  In addition, the duty of good faith and fair dealing "'does not deal with good faith in the formation of a contract.'"  *Scott Timber*, 692 F.3d at 1372 (quoting Restatement (Second) of

CONTRACTS § 205 cmt. c. (1981)); *id.* ("[B]ecause the existence of the covenant of good faith and fair dealing depends on the existence of an underlying contractual relationship, there is no breach of this covenant where a valid contract has not yet been formed." (quoting *Mountain Highlands, LLC v. Hendricks*, 616 F.3d 1167, 1171 (10th Cir. 2010) (alterations omitted)).

To prevail on a claim for breach of the implied duty of good faith and fair dealing, a plaintiff must show that the government acted in a way "specifically designed to reappropriate the benefits the other party expected to obtain from the transaction, thereby abrogating the government's obligations under the contract." *Precision Pine*, 596 F.3d at 829 (citing *Centex*, 395 F.3d at 1311). In other words, "liability only attaches if the government action 'specifically targeted' a benefit" of the government contract at issue, *Precision Pine*, 596 F.3d at 830, "so as to destroy the reasonable expectations of the other party regarding the fruits of the contract." *Centex*, 395 F.3d at 1304.

In this case, Sigma cannot premise a claim for breach of the implied duty of good faith and fair dealing on the alleged December 1, 2011 oral settlement agreement, since, unless and until a written modification had been mutually executed "a valid contract ha[d] not yet been formed." *Scott Timber*, 692 F.3d at 1372. To the extent that the CO made representations about her authority to finalize a settlement, assured Sigma that GSA review of Sigma's proposals had been ongoing, and later insisted on a third party audit of the proposals and requested that Sigma re-open negotiations, these facts are not relevant to a claim for breach of the implied duty of good faith and fair dealing, because the GSA had the right to verify the expenses Sigma claims and a binding settlement never materialized.

In addition, while it is true that the "[c]ovenant [of good faith and fair dealing] attaches to the underlying construction contract" (Pl.'s Resp. 10 (citing Compl. ¶¶ 50-53)), the duty "cannot expand a party's contractual duties beyond those in the express contract." *Precision Pine*, 596 F.3d at 830–31. Sigma has failed to identify any provision or term in the Contract requiring the GSA to pay $485,000, to waive a written contract modification, or settle the termination of the contract under the specific terms asserted in the December 12, 2012 Complaint. As discussed above, the FAR governs how the CO must proceed with the negotiation and settlement of a termination for convenience. Specifically, FAR 49.107(a) provides that the terminating CO must "refer each prime contractor settlement proposal of $100,000 or more to the appropriate audit agency for review and recommendations" and "*may* submit settlement proposals of less than $100,000 to the audit agency." 48 C.F.R. § 49.107(a) (emphasis added). After the GSA's internal review deemed Sigma's settlement proposals unacceptable, the CO's decision to submit this matter to a GSA auditor, even if inconsistent with prior statements regarding the necessity of review and even if the audit report would be "advisory only" (FAR 49.107(d)), was well within the CO's discretion. This action, like the CO's rationale for reopening negotiations and the GSA's requirement of a written contract modification to effectuate a valid settlement, in compliance with the FAR, does not amount to "specifically targeted" actions by GSA "designed to reappropriate the benefits the other party expected to obtain from the transaction, thereby abrogating the government's obligations under the contract." *Precision Pine*, 596 F.3d at 829–30. Therefore, the court has determined that the December 1, 2012 Complaint failed to plausibly state a claim for breach of the implied duty of good faith and fair dealing.

**IV.     CONCLUSION.**

For the foregoing reasons, the Government's April 19, 2013 Motion To Dismiss is granted.   The Clerk of the Court is directed to dismiss the December 12, 2012 Complaint, without prejudice.

**IT IS SO ORDERED.**

s/ Susan G. Braden
**SUSAN G. BRADEN**
**Judge**